# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 26, 2015

Lyle W. Cayce
Clerk

No. 13-20388

————

RUTHA CARROLL, Individually and as Heir of Herman Rochan Carroll (also known as Herman Rochan Barnes); HERMAN CARROLL, SR., Individually and as Heir of Herman Rochan Carroll (also known as Herman Rochan Barnes); CHASTITY RODGERS, As Next Friend of J. K. and M. B., Minor Children of Herman Rochan Barnes, Deceased,

Plaintiffs–Appellees,

v.

GEORGE W. ELLINGTON; ANDY VIRUETTE, JR., Harris County Sheriff's Deputy, in his individual and official capacity; JUAN CELESTIAL, Harris County Sheriff's Deputy, in his individual and official capacity; NICHOLAS CARTER, Harris County Sheriff's Deputy, in his individual and official capacity; REX EVANS, Harris County Sheriff's Deputy, in his individual and official capacity; KEVIN SIMS, Harris County Sheriff's Deputy, in his individual and official capacity; ANDY HULSEY, Harris County Sheriff's Deputy, in his individual and official capacity,

Defendants–Appellants.

————

Appeals from the United States District Court
for the Southern District of Texas

————

No. 13-20388

Before SMITH, PRADO, and OWEN, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Herman Barnes was a diagnosed paranoid schizophrenic. He died in 2006 after a confrontation in his home with Harris County sheriff's deputies. His surviving family members (the Carrolls) sued the deputies involved in the confrontation, asserting that the deputies' seizure of Barnes was unlawful, that the deputies' warrantless entry into his home was unreasonable, and that the deputies' use of force was excessive and deprived Barnes of his civil rights under the Fourth and Fourteenth Amendments in violation of 42 U.S.C. § 1983. The case proceeded to trial. After the jury deadlocked, the district court denied the deputies' motion for a directed verdict and declared a mistrial. The deputies seek interlocutory appeal from the district court's denial of their motion for a directed verdict. The deputies argue they are entitled to qualified immunity from § 1983 liability because their actions did not violate clearly established law. We first conclude that we have interlocutory appellate jurisdiction. We then agree with the deputies that they are entitled to qualified immunity on the unlawful-search-and-seizure claims and on most of the excessive-force claims, but not as to the excessive-force claims for the deputies' use of force after Barnes was subdued and ceased resisting. Accordingly, we reverse in part, dismiss in part, and remand.

## I.  BACKGROUND

Herman Rochan Barnes (also known as Herman Rochan Carroll) was an African American male who suffered from paranoid schizophrenia. Paranoid schizophrenia is a severe psychotic disorder, and people with paranoid schizophrenia "often have more difficulty interfacing in society with others." The disorder may be treated with "a combination of therapy and medication," and Barnes had antipsychotic medication in his system after the incident.

2

No. 13-20388

On the afternoon of October 6, 2006, Barnes stood outside of his home beside the subdivision's community mailboxes smoking a cigarette. Barnes's neighbor testified that when Barnes was off of his medication, he would often walk up and down his street talking to himself out loud "kind of just pacing." Because of the complicated trial testimony, a lengthy recitation of the facts is warranted before discussing the deputies' qualified-immunity defenses.

## A.    The Initial Detention

The Carrolls challenge the initial detention as unsupported by reasonable suspicion in violation of the Fourth Amendment, so we begin by reviewing the facts pertaining to this claim. Harris County Deputy Sheriff Andy Viruette, Jr., was on patrol that afternoon driving his marked Harris County patrol car in the Sterling Green subdivision of Channelview, Texas, when he spotted Barnes. Viruette testified that he had been made aware of complaints from the community's home-owner's association about "criminal mischief or vandalism in the neighborhood to the[] mailboxes" where Barnes was standing while smoking his cigarette. Viruette observed Barnes standing by the complained-about mailboxes and noticed that Barnes was "possibly fidgeting with the mail box." Viruette decided to drive past Barnes "to continue to observe what the male's intentions were by the mailbox. Deputy Viruette testified that he observed Barnes "stop[] doing" what he had been doing after Viruette's car passed by and, instead, Barnes moved toward the side of the mailboxes.

At this point, Viruette turned his car around and drove toward Barnes. As his car approached Barnes, Viruette and Barnes made eye contact, and then Barnes "immediately takes off walking . . . away from the mailbox . . . in a hurried manner." Suspicious that Barnes was either vandalizing the mailboxes or selling narcotics or drugs, Viruette decided to stop and speak with Barnes

3

"to ascertain if he lived . . . in the neighborhood and . . . if he had any business[] with those mailboxes as well."

Deputy Viruette followed Barnes to a nearby residence and stopped his patrol car in front. Viruette noticed that there was a different set of mailboxes in front of that house. Viruette wondered, "[W]hat [was Barnes's] business . . . over by the mailboxes that were on [the other street], if there is a mailbox in front of the house there where I had stopped."

Deputy Viruette rolled down his window and asked Barnes "what the address" of the residence was and what Barnes "was doing beside the mailbox as well." Barnes was unable to answer Deputy Viruette's questions; instead, Barnes said he was from California. Later, Barnes mentioned to Viruette that "this is my house," at which point Viruette "asked him what his address was." Barnes was unable to answer. As Deputy Viruette explained: "[H]is answers to me were totally left of what I was asking him . . . . That's what . . . raised my level of awareness." According to Deputy Viruette, this interaction in front of Barnes's home lasted about 45 seconds. Although Viruette testified that nothing "stood out" to him regarding mental illness, Viruette noticed "indicators that resembled possibly closely . . . that [Barnes] was possibly on some kind of either medication or narcotics, on illegal drugs, by his responses and also his body demeanor and his language."

Based on this information, Deputy Viruette believed he had the reasonable suspicion necessary to conduct a legal detention. Still inside his patrol car, Viruette questioned Barnes about his name and address. At this point, Barnes turned and walked at a "steady walk pace" toward the house. "

No. 13-20388

Barnes then manually opened the garage door of his house, which surprised Deputy Viruette.[1]

At this point, Viruette testified that he did not think that Barnes lived at that residence. Accordingly, when Barnes got to the garage door, Deputy Viruette ordered Barnes to stop and walk back toward Viruette's patrol car, but Barnes did not comply.

Barnes's neighbor was watching from across the street. He described the conversation between Deputy Viruette and Barnes as "normal." He testified that, when Deputy Viruette approached the door of the garage, Barnes repeatedly told the officer to "step away from his house" or to "please leave [his] home" perhaps as many as "three times."

## B.    The Warrantless Entry into the Residence

The Carrolls also challenge the warrantless entry into Barnes's home. Because Barnes did not comply with Viruette's command to stop and walk over to his car, Deputy Viruette testified that he then believed that Barnes "had committed the offense of evading detention." Viruette immediately exited his patrol car to pursue Barnes into the garage. Viruette entered the garage, and when Barnes attempted to open "the door that leads into the residence through the garage," Viruette physically grabbed Barnes's arm to prevent him from entering the residence. Viruette testified that he had been continually giving very loud verbal commands ordering Barnes to stop, but Barnes did not comply.

Barnes pulled away from Viruette and entered into his home; Viruette followed. They immediately entered a large living room, and Deputy Viruette

---

[1] Deputy Viruette testified: "Barnes turn[ed] and start[ed] towards the house where the garage door is opened . . . . At that point in time I was not expecting the [garage] door to come up, because at that point . . . he hasn't convinced me that he resides at that residence."

No. 13-20388

pulled out his Taser and ordered Barnes "to get on the ground." Barnes then sat down in a chair. While entering the house, Viruette radioed for backup.

It is undisputed that Deputy Viruette did not observe any weapons or contraband, or any other evidence of illegal conduct, inside Barnes's home.

## C.    The Use of Force

The Carrolls also challenge the deputies' use of force in the confrontation, which is discussed in detail below.

### 1.  Deputy Viruette's Use of Force

In spite of Viruette's commands for Barnes to get on the ground, Barnes remained seated and repeatedly said: "This is my house," and "I'm from California." Unsatisfied with Barnes's decision to sit in a chair rather than comply with Viruette's order to get down onto the floor, Deputy Viruette deployed his Taser while Barnes was seated.

Barnes still did not comply; instead, in response to the Taser shots, Barnes "constantly holler[ed,] again, that he was from California." A psychiatrist testified that those suffering from paranoid schizophrenia are prone to repeating themselves, clinically known as "perseveration," often out of the belief that "they're not being heard or understood." Viruette continued "giving verbal task directions."

After a second shot with the Taser, Barnes got up from the chair "and shift[ed] over to the kitchen area." As Barnes moved toward the kitchen, he began "flinging his arms wildly in an attempt to keep [Deputy Viruette] from coming to him." Barnes repeatedly yelled, "I'm from California."

At this point, Viruette decided to try to gain Barnes's compliance using a "drive stun" technique with his Taser. The drive stun technique involves placing the end of the Taser directly on the person, without the cartridge containing the metal probes (which had already been deployed twice). Each application of the drive stun technique delivers a jolt of electricity for about

five seconds. Viruette "deployed a drive stun three times," which he says had no effect. Barnes started swinging his arms, and he swung and knocked the Taser out of Viruette's hand and onto the ground, damaging the Taser. Viruette noticed the indicator light on the Taser "that lets you know that the Taser is still functional" was off. At some point in this altercation, Barnes struck Viruette on the shoulder—though, Viruette's shoulder did not later require medical attention.

Deputy Viruette then radioed again "asking for an assist." With his Taser damaged, Viruette believed the "only other tools . . . to gain compliance from Mr. Barnes" were his "OC Spray" (also commonly referred to as mace), his hands, and his service weapon. Viruette "decided because of the close proximity and close quarter combat positions that [they] were in, the OC spray . . . was not going to be the tool of . . . choice."

So Viruette drew his firearm "and maintained it in the low ready position" while he delivered snap kicks to Barnes and ordered Barnes to get on the ground. Barnes still refused to go to the ground.

### 2. Deputies Celestial, Sims, and Ellington Arrive at the Scene

Deputy Sims testified that, when he arrived at the residence, he immediately "heard two male voices yelling."[2] Sims and Celestial entered the residence, and Deputy Viruette told them that he needed help and "can't get [Barnes] handcuffed." Sims noticed that Viruette appeared "winded," so he and Deputy Celestial stepped between Viruette and Barnes.

---

[2] There is conflict in the testimony about whether Deputy Celestial and Deputy Sims arrived on the scene before or after Barnes stood up from the chair and entered the kitchen: Deputy Viruette testified that backup arrived *after* Barnes and he entered the kitchen; and Deputy Celestial testified that, when he arrived, Viruette and Barnes were struggling in the kitchen. Whereas, Sergeant Sims testified: "[Barnes] was sitting when I first got there and then he stood up."

No. 13-20388

Deputy Celestial swung a hickory baton and struck Barnes five to seven times in the thigh area, then twice on his right arm, and then once in the back. After Celestial repeatedly struck Barnes with his baton, Deputy Sims kicked him in the stomach while, according to Sims, Barnes was still standing up.[3]

According to the deputies' testimony, after withstanding multiple Taser shots, baton strikes, and a kick in the stomach, Barnes remained standing and refused to go to the ground: "He just . . . [took] a step back and that's it." Barnes was not saying anything, he just continued staring. Finally, Deputy Sims tackled Barnes by grabbing him around his neck and driving him to the ground with Sims' body weight in the living room area.

Deputy Sims ended up on top of Barnes's back after the tackle and then moved to subdue his legs, and Deputy Viruette managed to get a handcuff on Barnes's left wrist. In an effort to get handcuffs on Barnes's right arm, which was under Barnes's body at the time, Deputy Celestial punched Barnes's brachial nerve (where the neck meets the shoulder) with a closed fist (called a "brachial stun") five to eight times.

At this point, Deputy Ellington, arrived on the scene. With Barnes face-down, Deputy Sims on Barnes's legs, and deputies Viruette and Celestial on either side, Deputy Ellington reached over Sims's shoulder and applied his Taser using a drive-stun technique first to Barnes's right arm and then to Barnes's brachial nerve.

Deputy Sims, who was on Barnes's legs, testified that he himself weighed 225 pounds at that time. Celestial and Viruette were on either side of the 160-pound Barnes controlling his arms. Deputy Celestial weighed about 150 pounds, and Deputy Viruette weighed about 160 pounds. Deputy Ellington, who applied the Taser shot, weighed about 260 pounds.

---

[3] Sergeant Sims testified: "I [did] a forward thrust kick."

No. 13-20388

According to Deputy Sims, Barnes reacted to the Taser shot to his brachial nerve by "defecat[ing] on himself," and then, according to the deputies, Barnes "completely pushe[d] up and thr[ew] all three of us off."

Barnes was standing with stainless steel handcuffs around only one wrist, and Deputy Sims testified that the loose handcuff could be used as a weapon. Around this time, deputies Evans and Carter arrived on the scene. At least one Taser was then deployed when Barnes stood up. Deputies Evans and Ellington shot their Tasers conventionally, striking Barnes with the Taser probes. Deputy Hulsey then struck Barnes twice with a hickory stick.

Barnes then "became rigid and fell" onto a glass table that broke into many pieces, and Barnes fell on the glass shards. Viruette left the room to go to the hospital for treatment of a hand injury (strained ligaments in his left hand). After Barnes fell to the ground, Deputy Celestial also left the room. Around this time, Deputy Sims also testified that he left the house because he had Barnes's feces on him.

While on the ground, Barnes started low crawling toward the kitchen.[4] Deputy Hulsey then rushed Barnes and struck him around his legs and ankles with the hickory stick four times. A Taser was then deployed multiple times—it is unclear by whom—and Barnes finally went limp in the kitchen.[5] Deputy Hulsey observed "something white around [Barnes's] lips."

---

[4] According to Deputy Carter, Barnes stood up and grabbed one of the brass legs of the table, and he momentarily raised it as a weapon. Deputy Carter testified that he then pulled out his gun, pointed it at Barnes, and commanded Barnes to drop the table leg—which he did. However, this testimony is contradicted by Deputy Hulsey's trial and deposition testimony.

[5] Deputy Evans testified hearing multiple Taser shots. There is some testimony that Barnes removed the Taser probes from his chest and pulled a Taser away from an officer. But that testimony is vague and contradicted.

9

No. 13-20388

Deputy Carter then placed handcuffs on Barnes. At some point while Barnes was handcuffed and limp on the floor in the kitchen, Deputy Carter delivered "side strikes" to Barnes's left side.[6]

Although Deputy Sims testified that he was out of the room during the exchange with Barnes on the kitchen floor, Sims admitted at trial that he made a call to emergency medical services on the radio in which he stated that "the male appeared to be unresponsive as he laid on the floor."

The Harris County Sheriff's Department keeps a record of the downloaded information from the Taser guns. Each officer is assigned a specific Taser, but the "death in custody" incident report for Barnes includes the names of three officers (deputies Viruette, Sims, and Celestial) and four Tasers. Taser log records indicate that the Taser assigned to Deputy Evans was cycled two times during the incident, the Taser assigned to Deputy Ellington was cycled twenty-four times, and the Taser assigned to Deputy Viruette was cycled seven times. The fourth Taser was deployed twice, but it is unclear who was responsible. In total, the log registered thirty-five Taser cycles delivering electricity bursts of between three and eleven seconds.

**D.  Barnes's Death and Autopsy**

At some point during the struggle, Deputy Sims called emergency medical services. A part-time firefighter and licensed paramedic was the first emergency medical responder to arrive at the scene. The paramedic entered the house and found evidence of a struggle: "There was . . . broken glass on the ground and like some furniture discombobulated around. And there was a male who was in the prone position with handcuffs behind his back." Barnes was breathing but nonresponsive, and the paramedic asked the deputies to remove

---

[6] Carter testified that Barnes was kicking, but this testimony is inconsistent with Hulsey's recollection that Barnes was limp on the kitchen floor.

No. 13-20388

Barnes's handcuffs so he could check for a pulse. Initially, Barnes had a pulse, but his breathing rate was inadequate so the paramedics administered supplemental breathing.

When an ambulance arrived to take Barnes to a hospital, Barnes suffered a full cardiac arrest. Barnes's pulse stopped in the ambulance on the way to the hospital, and he was pronounced dead at Lyndon B. Johnson Hospital soon after he arrived.

A Harris County medical examiner performed an autopsy and ruled the manner of Barnes's death a homicide. The cause of death was listed as "[s]udden death during schizophrenic psychotic delirium following physical restraint." The toxicology findings revealed no alcohol or drugs in Barnes's blood stream and faint traces of ziprasidone, an antipsychotic medication. The pathological findings indicated blunt- and sharp-force injuries including: multiple contusions, subcutaneous hemorrhages, abrasions, and "superficial lacerations/incisional wounds of the head, torso and extremities"; puncture wounds on the chest, neck, left flank, and upper extremities, suggesting a "history of 'Taser' probe applications"; intramuscular hemorrhage of the right tongue, focal hemorrhage of the strap muscles of the anterior neck; and a right frontal intrascalp hemorrhage.

The medical examiner's "homicide" finding reflects a specific medical definition rather than the common, colloquial meaning of the word. In the comments section, the medical examiner explained the "mechanism of death . . . is likely related to autonomic stimulation during [a] psychotic episode. The manner of death derives from the events leading up to the death; the actions of others, regardless of intent, clearly exacerbated the psychotic delirium." "Therefore, but for the actions of others," the examiner concluded, "it is unlikely this man would have died at the time he did. The manner of death will be listed as homicide."

No. 13-20388

* * *

After a trial on the merits, the jury was unable to reach a verdict, and after several days, the district court declared a mistrial. The deputies filed a renewed motion for judgment as a matter of law that the district court denied. It is this decision that the deputies now timely appeal. The case is currently stayed pending appeal.

## II. JURISDICTION

There is a threshold dispute over our jurisdiction to hear this interlocutory appeal from the district court's denial of judgment as a matter of law. Ordinarily, we lack jurisdiction in the absence of a final judgment, and this Court has not yet had occasion to address whether the interlocutory denial of a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) rasied by public officials on the basis of qualified immunity is an appealable "final order" within the meaning of 28 U.S.C. § 1291. With the benefit of supplemental briefing on this question, we hold that we have jurisdiction to review purely legal questions in an interlocutory appeal from the     denial of a public official's Rule 50(b) motion asserting qualified immunity after a mistrial is declared.

The Supreme Court has held that interlocutory appellate jurisdiction includes pretrial denials of qualified immunity, reasoning that qualified immunity includes immunity from suit—a right not to stand trial that would be "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsythe*, 472 U.S. 511, 526–27 (1985). Accordingly, federal appellate courts have limited jurisdiction to review pure questions of law arising from the denial of motions to dismiss and motions for summary judgment in which public officials asserted qualified immunity as a defense. *E.g.*, *Behrens v. Pelletier*, 516 U.S. 299, 305–11 (1996).

12

No. 13-20388

The Second Circuit has applied this reasoning to authorize jurisdiction over purely legal questions arising from the denial of qualified immunity in Rule 50(b) motions for judgment as a matter of law after the jury has rendered a verdict and the district court has ordered a new trial on the issue of damages. *Britt v. Garcia*, 457 F.3d 264, 268, 271–72 (2d Cir. 2006). The court in *Britt* noted that interlocutory appeal of a pretrial denial of qualified immunity protects the right of public officials not to stand trial erroneously. *Id.* at 272. "[A]lthough it is too late to protect the appellants from standing trial," the court explained, "it is not too late to vindicate their right, if they are entitled to immunity, not to undergo a second one on the issue of damages." *Id.* at 272; *accord Hill v. Crum*, 727 F.3d 312, 317 (4th Cir. 2013); *Cassady v. Goering*, 567 F.3d 628, 634 (10th Cir. 2009).[7]

We find this reasoning persuasive. Because interlocutory appeal on qualified-immunity grounds would protect the right of public officials not to undergo a *second* trial erroneously, we agree with the Second Circuit that we have interlocutory appellate jurisdiction over the purely legal aspect of whether the officers in this case were entitled to qualified immunity.

We also reject the Carrolls' argument that this interlocutory appeal was untimely filed and therefore waived because the deputies did not file an interlocutory appeal from the district court's pretrial summary-judgment

---

[7] *But cf. Mercado v. Dart*, 604 F.3d 360, 362–66 (7th Cir. 2010) (dismissing appeal after concluding that the court lacked interlocutory appellate jurisdiction over a Rule 50(a) motion asserting qualified immunity mid-trial after the plaintiffs' case in chief). The court in *Mercado* reasoned that "both formal reasons (a mid-trial order is not 'final' and does not concern a 'right not to be tried') and practical ones (the need to prevent defendants from thwarting the completion of ongoing trials and disrupting the orderly management of litigation) [led the *Mercado* court] to conclude that a district judge's oral statement denying a mid-trial Rule 50 motion is not appealable as a 'collateral order' under § 1291." *Id.* at 364.

This situation is different from *Mercado* because, here, a mistrial has been declared after the trial—the district court did not deny a Rule 50 motion in the middle of trial. We express no opinion on whether interlocutory appeal may be taken except in these specific circumstances: officers moving for judgment as a matter of law after a mistrial is declared.

13

ruling. In this case, the deputies have consistently asserted, and therefore have not waived, the defense of qualified immunity. They timely filed an interlocutory appeal from the district court's denial of their Rule 50 motions soon after the district court ruled. Therefore, we have interlocutory appellate jurisdiction. *See Matherne v. Wilson*, 851 F.2d 752, 755–56 (5th Cir. 1988) ("Although Wilson was entitled to take an interlocutory appeal, . . . he was [not] obligated to do so." (footnote omitted)).

Our jurisdiction to review this collateral order is limited. We have jurisdiction to review only the "purely legal question whether a given course of conduct would be objectively unreasonable in light of clearly established law." *See Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013) (footnote and internal quotation marks omitted); *see also Taylor v. Rogich*, 781 F.3d 647, 650 (2d Cir. 2015) ("Because the appeal in this case is based on the sufficiency of the evidence, we hold only that such an appeal on qualified immunity grounds must be dismissed.").

## III.   STANDARD OF REVIEW

We review the denial of a Rule 50 motion for judgment as a matter of law based on "all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "We credit the non-moving party's evidence and disregard all evidence favorable to the moving party that the jury is not required to believe." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir.), *cert. denied*, 134 S. Ct. 88 (2013) (internal alteration and quotation marks omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151 (internal quotation marks omitted).

No. 13-20388

"[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that the inquiry under each is the same," *id.* (internal quotation marks omitted), so we use a similar standard of review to assess this interlocutory appeal from the denial of the officers' renewed Rule 50 motion as we would in an ordinary interlocutory appeal from a denial of summary judgment on qualified-immunity grounds. *See Cassady*, 567 F.3d at 634. In the qualified-immunity context, we review only the "purely legal question whether a given course of conduct would be objectively unreasonable in light of clearly established law." *Hogan*, 722 F.3d at 731 (footnote and internal quotation marks omitted). In other words, "[w]here, as here, the district court finds that genuinely disputed, material fact issues preclude a qualified immunity determination [as a matter of law], this court can review only their materiality, not their genuineness." *Manis v. Lawson*, 585 F.3d 839, 842 (5th Cir. 2009).

If a fact is not undisputed, we must "accept the plaintiffs' version of the facts as true." *Hogan*, 722 F.3d. at 731 (quoting *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004) (en banc)). A fact issue is material only if it is legally significant, in that its resolution could affect the disposition of the claim. *Minter v. Great Am. Ins. Co.*, 423 F.3d 460, 465 (5th Cir. 2005). "In reviewing the district court's conclusions concerning the legal consequences—the materiality—of the facts, our review is of course *de novo*." *Hogan*, 722 F.3d at 731 (footnotes and internal quotation marks omitted).

## IV.  DISCUSSION

The deputies appeal the district court's denial of their motions for judgment as a matter of law based on qualified immunity. Qualified immunity protects governmental officials from liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rockwell v. Brown*, 664 F.3d 985, 990

15

(5th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

To evaluate whether a government official is entitled to qualified immunity, we conduct a two-prong inquiry: we ask (1) whether the undisputed facts and the disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right, and (2) whether the defendant's conduct was "objectively reasonable in light of clearly established law." *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001).[8] A government official's acts are not objectively unreasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights. *Id.* We have discretion to address either prong first without necessarily addressing the other. *Pearson*, 555 U.S. at 236. With these principles in mind, we turn now to the Carrolls' constitutional claims.

## A.    Illegal Search and Seizure Claims Against Deputy Viruette

The Carrolls allege that Deputy Viruette violated Barnes's Fourth Amendment right to freedom from unreasonable searches and seizures by detaining him without reasonable suspicion, arresting him without probable cause, and entering his residence without a warrant. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). As such, it is clearly established that law enforcement may temporarily stop an individual for investigation based on reasonable suspicion that criminal activity is afoot, *see Terry v. Ohio*, 392 U.S.

---

[8] Clearly established law is based on the state of the law in effect at the time of the alleged violation. *Thompson*, 245 F.3d at 457.

1, 27 (1967), and may effect a warrantless arrest based on probable cause, *Hogan*, 722 F.3d at 731. Although a warrantless search of a home is presumptively unreasonable, "the warrant requirement is subject to certain exceptions." *Stuart*, 547 U.S. at 398. We address each of the Carrolls' Fourth Amendment claims against Deputy Viruette in turn below.

### 1. Deputy Viruette Is Entitled to Qualified Immunity for His Seizure of Barnes

The Carrolls argue that Viruette's initial detention of Barnes was unconstitutional because Viruette lacked objectively reasonable suspicion that Barnes had committed or was committing a crime. The Carrolls also contend that Deputy Viruette unlawfully arrested Barnes without a warrant and without probable cause. Viruette counters that he did not detain Barnes until Barnes started to walk away from him, and at that point Viruette reasonably suspected Barnes was engaged in drug dealing or vandalism. Viruette also argues that he never actually arrested Barnes. Even so, Viruette argues in the alternative that the warrantless arrest was supported by probable cause.

We must first decide whether and when Viruette seized Barnes within the meaning of the Fourth Amendment. A "person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In the absence of physical force to restrain a suspect, "[a] police officer may make a seizure by a show of authority . . . , but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007).

We conclude that Barnes was not seized within the meaning of the Fourth Amendment until Viruette grabbed his arm. Contrary to the Carrolls'

17

allegations, Barnes's initial interaction with Deputy Viruette was not a seizure because a reasonable person in his circumstances would have felt free to leave. *See INS v. Delgado*, 466 U.S. 210, 215 (1984) (holding that "an initially consensual encounter between a police officer and a citizen" transforms "into a seizure or detention within the meaning of the Fourth Amendment,[only] 'if . . . a reasonable person would have believed that he was not free to leave.'" (citation omitted)). Moreover, contrary to Deputy Viruette's contention, the initially consensual encounter did not become a seizure when Viruette ordered Barnes to stop and return to the patrol car, because Barnes walked away into his garage and did not submit to Viruette's show of authority. *See California v. Hodari D.*, 499 U.S. 621, 626, 629 (1991) ("[Y]elling 'Stop, in the name of the law!' at a fleeing form that continues to flee . . . is no seizure. . . . [S]ince Hodari did not comply with that injunction he was not seized until he was tackled.").

We conclude that Viruette's initial seizure of Barnes by restraining his arm was a physical *Terry* stop, not an arrest. A seizure rises to the level of an arrest only if "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Corral-Franco*, 848 F.2d 536, 540 (5th Cir. 1988). In *United States v. Sokolow*, the Supreme Court held that, when a police officer grabbed the suspect by the arm to "briefly detain a person for investigative purposes," that temporary investigatory detention was lawful "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" 490 U.S. 5, 7 (1989). Here, Viruette grabbed Barnes's arm to prevent him from entering the residence and to investigate whether Barnes in fact lived at that address. Because this physical restraint—grasping one arm—did not restrain Barnes's freedom to the degree of a formal arrest, we conclude that Viruette's physical

18

restraint was a *Terry* stop, which would be lawful if based on reasonable suspicion, "even if [he] lack[ed] probable cause," *Sokolow*, 490 U.S. 7.

Thus, we must next assess whether Barnes's initial detention was supported by reasonable suspicion. "[P]olice officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). Reasonable suspicion requires "the police officer . . . to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Rodriguez*, 564 F.3d 735, 741 (5th Cir. 2009) (quoting *Terry*, 392 U.S. at 21). This standard "requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (internal quotation marks omitted). We assess the reasonableness of the stop "by conducting a fact-intensive, totality-of-the circumstances inquiry," *id.*, and we consider only the "information available to the officer[s] at the time of the decision to stop a person," *United States v. Silva*, 957 F.2d 157, 160 (5th Cir. 1992).

We conclude that the Carrolls have not shown that Viruette was objectively unreasonable in light of clearly established law in initially attempting to detain Barnes for investigatory questioning. At the time that Barnes attempted to enter the residence, Viruette had the following information available to him: (1) complaints from the community's homeowner's association about criminal mischief or vandalism to the neighborhood communal mailboxes, (2) Barnes had been observed near those mailboxes, (3) when Deputy Viruette turned around his patrol car and made eye contact with Barnes, Barnes took off "away from the mailbox . . . in a hurried manner," (4) Barnes walked to a residence in front of which there was a different set of mailboxes, and (5) when Deputy Viruette asked Barnes about his address,

Barnes replied that he was "from California." Deputy Viruette had no knowledge of Barnes's mental illness. Thus, based on the totality of the circumstances and the information available to the officer, Deputy Viruette was not objectively unreasonable, in light of clearly established law, in suspecting that criminal activity was afoot—namely, vandalism of the mailboxes or that Barnes intended to enter a residence that was not his own. *See Thompson*, 245 F.3d at 457 (holding that an official is entitled to qualified immunity unless the plaintiff can demonstrate that his conduct was "objectively reasonable in light of clearly established law").

The Carrolls point to no case roughly analogous in which this Court or any other has found a Fourth Amendment violation. On the contrary, the Supreme Court has held that a suspect's presence in an area of known criminal activity—taken together with a suspect's nervous, evasive behavior—may support an officer's reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000). Here, Viruette had information that the community mailboxes had been vandalized, spotted Barnes near those mailboxes, and when he approached Barnes, Barnes turned and walked away. Although "*Wardlow* did not establish a bright-line test," *United States v. Jordan*, 232 F.3d 447, 449 (5th Cir. 2000), and there are facts that distinguish this case from the circumstances in *Wardlow*, we do not think that "all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated" the plaintiff's rights, *Thompson* 245 F.3d at 457. Thus, we conclude that the Carrolls have not shown—even accepting their version of the disputed facts—that Deputy Viruette's seizure was objectively unreasonable in light of clearly established law. Therefore, Deputy Viruettte is entitled to qualified immunity on this claim.

Further, when Barnes pulled away, Viruette was not objectively unreasonable in believing that there then existed probable cause to arrest

Barnes with additional physical force. "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge *at the moment of arrest* are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Id.* (internal quotation marks omitted). "If an officer reasonably but mistakenly believes that probable cause exists, he is entitled to qualified immunity." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (citing *Club Retro, LLC*, 568 F.3d at 206).

When Viruette attempted to enter the residence despite Viruette's commands to stop, the record establishes that Barnes pulled his arm out of Deputy Viruette's grasp. As we have previously held, "[t]he great weight of Texas authority indicates that pulling out of an officer's grasp is sufficient to constitute resisting arrest," and "the act of resisting [arrest] can supply probable cause for the arrest itself." *Ramirez*, 716 F.3d at 376 (collecting cases). We decline to reach the constitutional question on the illegal arrest claim, however. Because Viruette's initial detention was not objectively unreasonable in light of clearly established law, Viruette's belief there was probable cause to arrest Barnes when Barnes pulled away from his attempt to prevent entry into the dwelling was also not objectively unreasonable in light of clearly established law.

Therefore, Viruette is entitled to qualified immunity on the Carrolls' illegal-arrest claim. *See Ramirez*, 716 F.3d at 375 ("If an officer reasonably but mistakenly believes that probable cause [to arrest] exists, he is entitled to qualified immunity.").

### 2. Deputy Viruette Is Entitled to Qualified Immunity for the Warrantless Entry into Barnes's Home

The Carrolls also challenge Deputy Viruette's warrantless entry into the residence in pursuit of Barnes. The Fourth Amendment prohibits unreasonable searches, and a warrantless entry into a person's home is

No. 13-20388

presumptively unreasonable. *United States v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011). "[T]he warrant requirement is subject to certain exceptions." *Stuart*, 547 U.S. at 403. Because a warrantless entry into a home "is presumed to be unreasonable," the officer "has the burden of proving that the warrantless search was conducted pursuant to an exception." *United States v. Riley*, 968 F.2d 422, 424–25 (5th Cir. 1992).

Deputy Viruette justifies his warrantless entry into Barnes's home under the exigent-circumstances exception to the warrant requirement. Viruette contends that he was in hot pursuit of Barnes for evading detention and arrest. Specifically, Viruette contends that, under Texas law, "an officer may enter a residence to make a warrantless arrest" of a suspect seeking to avoid detention or arrest—which is a misdemeanor offense—and that federal law is not clearly established. In their response brief, the Carrolls do not specifically elaborate on their warrantless-home-entry claim, except to reiterate, generally, that the initial detention and subsequent arrest violated Barnes's Fourth Amendment rights, as discussed above.

The Supreme Court recently held that, as of 2013, "federal and state courts nationwide are sharply divided on the question whether an officer with probable cause to arrest a suspect for a misdemeanor may enter a home without a warrant while in hot pursuit of that suspect." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam). The Court held that an officer who entered a home in 2008 in hot pursuit of a suspected misdemeanant was therefore entitled to qualified immunity because the law was not clearly established at the time of the officer's conduct. *Id.* at 3, 5–7. The Court specifically noted that "[i]t is especially troubling that the Ninth Circuit would conclude that Stanton was plainly incompetent—and subject to personal liability for damages—based on actions that were lawful according to courts in the jurisdiction where he acted," referring to state courts in California. *Id.* at 7.

No. 13-20388

Here, like the California courts mentioned in *Stanton*, Texas courts have upheld warrantless entries in hot pursuit of persons suspected of committing the misdemeanor offense of evading detention or arrest.[9] The Carrolls do not point to authority that the law on hot pursuit of misdemeanor suspects was any clearer in 2006, when Viruette entered the residence, than in 2008, when the Supreme Court ruled the law was not then clearly established. *Id.* at 5–7. Therefore, the Carrolls have not met their burden, *see Club Retro,* 568 F.3d at 194, and Viruette is entitled to qualified immunity—though we express no view on whether Viruette's entry into Barnes's home was constitutional.

## B.     Excessive-Force Claims

The Carrolls allege that Deputy Viruette, Deputy Celestial, Deputy Ellington, Deputy Carter, Deputy Evans, and Deputy Hulsey used excessive force in repeatedly applying their Tasers to Barnes and striking Barnes with batons, kicks, and punches to subdue and arrest Barnes. The Carrolls also allege Deputy Sims unconstitutionally stood by the scene and neglected to intervene under a "bystander liability theory." To establish a Fourth Amendment excessive-force claim, "a plaintiff must first show that she was seized. Next she must show that she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Flores*, 381 F.3d at 396 (citation omitted).

In this case, it is undisputed for purposes of this interlocutory appeal that Barnes died as a result of the deputies' use of force to attempt to subdue

---

[9] *See, e.g.*, *Rue v. State*, 958 S.W.2d 915, 918 (Tex. App.—Houston [14th Dist.], 1997, no pet.) ("An officer's hot pursuit of an offender seeking to avoid arrest is an exigent circumstance justifying nonconsensual entry into the offender's residence."); *LaHaye v. State*, 1 S.W.3d 149, 151–52 (Tex. App.—Texarkana 1999, pet. ref'd) ("We conclude that the arrest of LaHaye was [lawful because Officer] Martin was in hot pursuit of LaHaye" for evading arrest, "a Class B misdemeanor").

23

and arrest Barnes, so the only issue is whether each deputy's use of force was clearly excessive to the need and objectively unreasonable. In assessing the reasonableness of the use of force, we give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

In accordance with our case law, we "examine each individual's entitlement to qualified immunity separately" below, *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007) (holding that "the district court erred in considering the officers' actions together").

### 1. *Deputy Viruette's Use of Force*

Because it was not clearly established as of 2006 whether an officer could use this level of nonlethal force on a noncompliant suspect resisting arrest for refusing commands to get on the floor, Deputy Viruette is entitled to qualified immunity on this claim.

No. 13-20388

The evidence from Viruette's Taser log establishes that Deputy Viruette successfully deployed[10] his Taser seven times: four times for five seconds, once for six seconds, once for nine seconds, and once for eleven seconds. Deputy Viruette first fired Taser probes at Barnes when Barnes was sitting in a wicker chair in his living room—and it is undisputed that Barnes's arms were in full view and that he was not brandishing any weapons. Viruette deployed his Taser because Barnes, who entered the home to avoid detention and arrest, would not comply with Viruette's order that Barnes get on the floor. The ensuing struggle in the kitchen between Barnes and Viruette followed directly from the initial application of the Taser to the seated Barnes, and Barnes's active resistance at that point rendered Viruette's escalation of force—to include additional Taser applications and hand-to-hand strikes—objectively reasonable in the circumstances. *See Graham*, 490 U.S. at 396 (instructing courts to evaluate "whether the suspect poses an immediate threat to the safety of the officers" and "whether he is actively resisting arrest or attempting to evade arrest by flight"); *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (holding that officers who "responded with 'measured and ascending' actions that corresponded to Poole's escalating verbal and physical resistance" were entitled to qualified immunity). However, the *initial* application of the Taser to the seated and unarmed Barnes on suspicion of vandalism and trespass presents a difficult question whether a reasonable jury could find this first use of force to be clearly and objectively excessive. We decline to reach the close constitutional question and instead decide the case on the second prong of qualified immunity. *See Pearson*, 555 U.S. at 236.

---

[10] Deputy Viruette maintains that the Taser did not deploy properly and make contact with Barnes, and there is certainly a fact dispute whether this is so; however, a jury would not be required to accept Viruette's testimony, because it is contradicted by the duration of the Taser applications and the reasonable inferences a jury could draw therefrom, in the light most favorable to the Carrolls.

No. 13-20388

The issue, then, is whether an officer's application of a Taser to an unarmed, seated suspect who fails to comply with an order to get on the ground is "objectively unreasonable in light of clearly established law." *Hogan*, 722 F.3d at 731. We conclude that it is not. Testimony at trial and case law establish that officers are trained to use nonlethal force to gain compliance if a subject actively resists arrest and does not comply with verbal task directions to get on the ground. *See, e.g.*, *Poole*, 691 F.3d at 629; *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (per curiam); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) ("Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance."). Officers are trained in this manner because a police officer who is standing over a suspect who is on the ground has a "position of advantage over that subject," meaning the officer "can control [the subject's] body movement," and that "the subject will offer less resistance."

Whether a Taser could be used to gain compliance in this circumstance was not clearly established in 2006. The en banc Ninth Circuit confronted a similar situation in *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011). There, as here, the officers applied a Taser to a suspect who refused to comply with verbal task directions. The plaintiff in *Mattos* was a pregnant woman who had refused to sign a traffic citation for driving thirty-two miles per hour in a twenty-mile-per-hour school zone. *Id.* at 436–37. The officers were then required to arrest her, and when she refused to exit the vehicle, the officers threatened to apply a Taser. *Id.* at 437. Even though the plaintiff informed the officers that she was "less than 60 days from having my baby," they applied the Taser to her three times in about one minute because she continued to refuse to exit the vehicle, clutching the steering wheel. *Id.* The court surveyed circuit case law that existed before the traffic stop in November 2004. *Id.* at

26

446–47. The court held that the use of force was excessive, but concluded that, as of 2004, the law was not clearly established and granted qualified immunity. *Id.* at 448. The court followed its prior decision in which the Ninth Circuit held that, in a "tasing [that] took place in 2005," "in that year 'there was no Supreme Court decision or decision of our court addressing' the use of a taser" in those circumstances. *Id.* at 448 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 833 (9th Cir. 2010)). Similarly, the Sixth Circuit held that "it was [not] clearly established in May 2007 that using a taser repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted to excessive force." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012).

We agree with the Ninth Circuit's and the Sixth Circuit's conclusion that, as of October 2006, the law was not clearly established that using a Taser to gain compliance of a unarmed, seated suspect for resisting arrest and failing to follow verbal commands was clearly excessive and objectively unreasonable.[11] The Carrolls point to no case clarifying the law between 2005 (when the Ninth Circuit found the law to be unclear) and the tasing in this case in October 2006,[12] and we are aware of none. Therefore, we conclude that Deputy Viruette is entitled to qualified immunity on the Carrolls' excessive-force claim.

---

[11] *See, e.g.*, *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (rejecting claims that the use of a taser constituted excessive force); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781–82 (10th Cir. 1993) (same); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir. 1992) (same); *see also Mattos*, 661 F.3d at 448 ("[W]hen the defendant officers tased Brooks [in 2004], there were three circuit courts of appeals cases rejecting claims that the use of a taser constituted excessive force; there were no circuit taser cases finding a Fourth Amendment violation.").

[12] The Carrolls cite *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012), but that case is distinguishable. There, "the officers immediately resorted to taser and nightstick without attempting to use . . . commands," *id.* at 763, whereas, here, Deputy Viruette only resorted to force after verbal commands were ignored. Corroborated testimony relied on by the district court and not disputed by the Carrolls establishes that the deputies continually delivered verbal task instructions before resorting to force and throughout the encounter.

## 2. *Deputies Celestial's and Ellington's Use of Force to Get Barnes on the Ground and Handcuffed*

Deputies Celestial and Sims[13] responded to Viruette's call for backup from about a mile away and arrived soon after Viruette applied the Taser to Barnes, as the struggle moved from the living room into the kitchen. Viruette was continually giving Barnes verbal commands to get on the ground. At this point, neither Celestial nor Sims had knowledge of the offense for which Viruette was attempting to make an arrest, just that Viruette could not get Barnes restrained and handcuffed. Viruette appeared winded from the struggle, so Deputy Celestial and Deputy Sims stepped between Barnes and Viruette. Because Barnes was actively resisting Deputy Viruette, deputies Celestial and Sims delivered nonlethal force: Deputy Celestial repeatedly struck Barnes in the leg and thigh area with a hickory stick, and Deputy Sims kicked Barnes in the stomach area. Finally, Sims tackled Barnes to the ground.

Deputy Sims climbed on top of Barnes, and Deputy Viruette handcuffed Barnes's left wrist. Deputy Celestial struck Barnes with his fists in an effort to gain access to his right wrist. At this point, Deputy Ellington arrived on the scene. Ellington applied his Taser several times in an effort to get Barnes to comply so that he could be detained and arrested. Deputy Viruette then left the room to go to the hospital for treatment of a hand injury.

Having considered the entire record and each individual's use of force, we conclude that the deputies' use of force in getting Barnes onto the ground was not unreasonable under the circumstances. By all accounts, after the initial Taser discharge, Barnes failed to comply with verbal task directions and actively resisted all attempts to subdue and detain him. We find it significant that only nonlethal force was used throughout this portion of the encounter.

---

[13] The district court granted summary judgment to Deputy Sims, and the Carrolls do not appeal this judgment.

We judge the officers' conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Rockwell*, 664 F.3d at 991. Deputies Celestial and Ellington "responded with 'measured and ascending' actions that corresponded" to Barnes's "escalating . . . physical resistance." *Poole*, 691 F.3d at 629. Thus, they are each entitled to qualified immunity for this portion of the encounter.

### 3. Deputies Celestial's, Ellington's, Carter's, Evans's, and Hulsey's Use of Force Once Barnes Was Restrained

At some point after Barnes was tackled to the ground, handcuffed, and held down and surrounded by several deputies, the district court found that the sheriff's deputies "deliver[ed] strikes" to Barnes. Deputies Celestial, Ellington, Carter, Evans, and Hulsey argue that they are entitled to judgment as a matter of law because their use of force was reasonable in the circumstances. They argue their use of force was justified because they "were dealing with an actively resisting suspect," and they discontinued their use of force when "he stopped resisting."

Because we lack jurisdiction to review the genuineness of a fact issue precluding judgment as a matter of law, we cannot accept the deputies' interpretation of the record that the use of force discontinued when Barnes stopped resisting. At least one deputy admitted that he delivered "side strikes" *after* Barnes had been handcuffed. Deputy Carter testified that Barnes continued to resist while he was placed in handcuffs, but this testimony is contradicted by testimony that Barnes was limp on the kitchen floor when he was handcuffed.

The issue, then, is whether a reasonable jury could conclude that continued force applied *after* a suspect has been restrained and *after* the suspect stops resisting may be clearly excessive and objectively unreasonable. The law was clearly established at the time of the deputies' conduct that, once

29

a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive. *See, e.g.*, *Bush v. Strain*, 513 F.3d 492, 501–02 (5th Cir. 2008); *Gomez v. Chandler*, 163 F.3d 921, 922, 924–25 (5th Cir. 1999) (concluding that use of force "while [a prisoner's] hands were handcuffed behind his back" could be considered excessive, precluding summary judgment). This includes repeated applications of a Taser after a suspect is arrested, subdued, and "no longer resisting arrest." *Anderson v. McCaleb*, 480 F. App'x 768, 773 (5th Cir. 2012) (per curiam); *Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005). Thus, the deputies are not entitled to qualified immunity as a matter of law for injuries Barnes sustained after he was handcuffed and restrained and after he stopped resisting arrest.

Because we lack jurisdiction to review the district court's fact determinations, we cannot say on this record—rife with inconsistencies and contradictions—at which point Barnes was restrained and subdued after he had been tackled to the ground. Accordingly, we dismiss this portion of deputies Celestial's, Ellington's, Carter's, Evans's, and Hulsey's interlocutory appeal for lack of jurisdiction.

### 4. *Deputy Sims's Bystander Liability for Failing to Intervene*

The Carrolls allege that Deputy Sims violated Barnes's Fourth Amendment right to be free from unreasonable and excessive force by failing to intervene to stop the other deputies. Deputy Sims argues that he is entitled to judgment as a matter of law because he "was not present in the house during this entire incident," explaining that he had "exited the house after Barnes fell." Sims elaborates that, after he returned to the scene, Barnes had been "detained and the event ended."

The law as of 2006 was clearly established that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale*

*v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). To establish this claim, the Carrolls must show that Sims "(1) kn[ew] that a fellow officer [was] violating an individual's constitutional rights; (2) ha[d] a reasonable opportunity to prevent the harm; and (3) cho[se] not to act." *Kitchen v. Dallas Cnty., Tex.*, 759 F.3d 468, 480 (5th Cir. 2014).

Deputy Sims's principal argument is that he did not have a reasonable opportunity to prevent the harm because he was not present when his fellow deputies continued to strike Barnes—he had left the house. If this is true, then Deputy Sims would be entitled to qualified immunity on this claim. But the record is unclear on this point. The only testimony comes from Deputy Sims, and it is possibly inconsistent with Sims's admission at trial that he made the call to emergency medical services in which he stated "the male appeared to be unresponsive as he laid on the floor," which suggests Sims observed Barnes "go limp" in response to Taser strikes after he had been handcuffed. Additionally, it is unclear whether Barnes had been subdued before Sims claims to have left the room for the reasons stated above.

Because Deputy Sims's qualified-immunity interlocutory appeal turns on questions of fact that the district court found disputed, we lack jurisdiction. Therefore, we dismiss Deputy Sims's interlocutory appeal for lack of jurisdiction.

## V. CONCLUSION

For the foregoing reasons, we REVERSE the district court's decision denying qualified immunity to Deputy Viruette. We also REVERSE and hold that Deputy Celestial and Deputy Ellington are entitled to qualified immunity for their efforts to get Barnes restrained and on the ground. Because we conclude that deputies Celestial's, Ellington's, Carter's, Evans's, Hulsey's, and Sims's qualified-immunity appeals—arising from their use of force after Barnes had been restrained and handcuffed—turn on questions of fact the

No. 13-20388

district court found disputed, we DISMISS these interlocutory appeals for lack of jurisdiction and REMAND for proceedings consistent with this opinion.