## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-20350

United States Court of Appeals
Fifth Circuit

**FILED**
August 17, 2018

Lyle W. Cayce
Clerk

GREGORY TODD SAMPLES,

　　　　Plaintiff - Appellee

v.

DEPUTY JEFFREY VADZEMNIEKS,

　　　　Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Today we review a denial of a law officer's motion for summary judgment on the basis of qualified immunity on a claim of excessive force in a tasing. We reverse the denial of summary judgment to the law officer and render judgment to him.

## I.

On January 29, 2014, Deputy Frederick McGregor, a member of the Harris County Sheriff's Office, received a terse message from his dispatcher while on patrol: to report to a given location to track down "a white male calling for help." McGregor hurried to the location—a gated community—and as he drove into it, a man quickly waved him over, reporting that someone was

wandering through the neighborhood half-naked, and that whoever it was had left his wallet and clothing in the middle of the roadway. The man guided McGregor deeper into the neighborhood, finding Gregory Samples standing in the middle of the road, stripped to his boxers and speaking to another person; both this unnamed person and the one who led McGregor to Samples left upon McGregor's arrival on the scene. McGregor arrived at approximately 4:05 a.m.

The temperature was in the low 30s, and Samples had his arms wrapped around himself for warmth, visibly shivering. Samples was 50 years old and only stood at 5'3" and weighed approximately 154 pounds, with bruises on his feet and knees. He was carrying his own dentures in his hand.

When McGregor approached to speak with him, Samples would wander off. McGregor quickly came to believe that Samples was intoxicated. Samples expressed a desire to call his sister, but while McGregor repeatedly tried to coax him into the warmth and safety of his patrol car, Samples walked away from him. After several minutes, at roughly 4:08 a.m., Deputy Jeffrey Vadzemnieks arrived on the scene. Vadzemnieks was assigned to serve as the backup unit to McGregor for the disturbance call. When Vadzemnieks arrived, he noticed that Samples was "speaking incoherently and appeared intoxicated," and he witnessed Samples continually wandering away from McGregor.

McGregor worried that Samples was gradually drawing closer to a water retention pond, though it was still approximately 600 feet away. Thus, upon Vadzemnieks's arrival, McGregor got into his patrol car and tried to use it to cut Samples off. However, Samples simply walked around the patrol car and continued his wandering. At some point, Vadzemnieks claims that he witnessed McGregor order Samples to stop walking away, but that Samples disregarded him. However, McGregor characterizes his interactions with

No. 17-20350

Samples after Vadzemnieks's arrival as two mere requests—not commands—that Samples enter his patrol car. Samples uttered something about going to a nearby friend's house and ignored McGregor. McGregor then attempted to restrain Samples by grabbing his arm, but Samples "growled at [him] and tensed up." Samples reportedly clenched his fists and turned towards McGregor, who retreated some distance away. Vadzemnieks's characterization goes further; he claims that Samples "broke away" from McGregor and adopted a "fighting stance." Fearing for his friend's safety, Vadzemnieks took out his taser and fired it at Samples, striking him in the left arm and leg.[1] At the time he was hit with the taser, Samples was standing in the street, near the curb. Samples cursed and fell backwards towards the center of the street, onto his back. Vadzemnieks does not "recall [Samples] hitting his head," and McGregor "did not see [] Samples hit his head." While Samples was lying on the ground, McGregor handcuffed him and noticed that he was "still tensing up." Samples then rolled onto his side and briefly began kicking his legs. At some point, Vadzemnieks reported that Samples began snoring. At 4:11 a.m., several minutes after Vadzemnieks's arrival, McGregor informed headquarters of the taser deployment.

The two men claim to have promptly contacted EMS[2] and headquarters to request a supervisor, and McGregor turned on his car strobes to ensure that the EMS personnel could find them. McGregor then returned to Samples, who had become unresponsive. After initially going to the wrong location several blocks away, the EMS team arrived at 4:18 a.m.; they noted that Samples was

---

[1] The district court claimed that Vadzemnieks "hit Samples twice with his taser," but this is apparently only true insofar as the taser had two probes—the record suggests that Vadzemnieks only actually fired it once, and the taser went off for a total of five seconds.

[2] The call history indicates that McGregor first contacted EMS almost immediately upon Vadzemnieks's arrival on the scene, at approximately 4:08 a.m., and before any taser use was reported.

"laying prone, head turned to the right with his left cheek in the street." He had abrasions on his left cheek as well as along the left side of his body, which appeared to be of recent origin. He was motionless. It is not clear who spoke with EMS, but the record indicates that a member of the Harris County Sheriff's Office—presumably either McGregor or Vadzemnieks—"denied [to EMS that Samples] was combative, stating 'he just kept repeating that he needed to call his sister.'"

At 4:27 a.m., a supervisor, Sergeant Anthony Schattel, arrived on the scene. The EMS staff had already loaded Samples onto the ambulance by that point; Schattel instructed McGregor to go along with him, while Schattel went back to the police station with Vadzemnieks to fill out the required paperwork. EMS transported Samples to Memorial Hermann Northeast Hospital and McGregor trailed behind. When McGregor arrived at the hospital, the EMS supervisor told him about a pile of clothes and a house with an open door near the incident scene, so McGregor drove back to that address and found an empty home with nothing of interest.[3] When McGregor returned to the hospital, he learned that Samples's condition had dramatically deteriorated; the medical personnel discovered that Samples had suffered life-threatening brain damage: an acute subdural hematoma and a fractured skull. Samples's condition was so serious that he had to be immediately lifted, via helicopter, to another hospital for emergency brain surgery. McGregor relayed this information to Schattel and Vadzemnieks. He then promptly contacted the District Attorney's Office and received permission to file resisting arrest charges against Samples, which he did the following day. The record is unclear on what became of these charges.

---

[3] He reports finding a nonusable amount of "what appeared to be marijuana residue" in a bedroom and a phone number he unsuccessfully attempted to use to speak with someone.

No. 17-20350

At some point several days later, one of Samples's two sisters, Gail Cooper, contacted McGregor and informed him that Samples had a history of drug abuse but that she had believed him to have "cleaned up." Medical records indicate that Samples tested positive for methamphetamines in his system that night.

The ensuing internal investigation of the incident was completed in August 2014; Schattel was reprimanded for providing insufficient notification to his superiors of the seriousness of the incident and of Samples's ongoing condition.[4] Neither McGregor nor Vadzemnieks apparently suffered any negative consequences as a result of their actions.

For his part, Samples was not discharged from the hospital until over a month after the incident, on March 7, 2014. He remembers nothing of the night. Nor was any of the incident captured on video; for unknown reasons, neither Vadzemnieks nor McGregor activated his patrol car dash-cam before initiating contact with Samples. The only available footage was taken beginning at 4:14 a.m., after the taser had already been deployed, and it shows McGregor and Vadzemnieks standing over Samples's body, with Samples eventually being loaded onto a gurney upon the arrival of the EMS personnel. The magistrate judge characterized this omission as "particularly unfortunate" and opined that it represented a violation of the relevant policy.

On March 29, 2016, Samples sued, asserting 42 U.S.C. § 1983 and negligence claims against McGregor, Vadzemnieks, Harris County, and several other individual defendants. The case was removed to the Southern District of Texas. All claims against Harris County, McGregor, and the various

---

[4] Schattel apparently claimed that he believed Samples to have been transported to the hospital only because of his altered mental state. Yet this claim appears to be belied by McGregor's assertion that he specifically notified Schattel of Samples's need for brain surgery.

other individual defendants were dismissed for failure to state a claim. The sole remaining claim was the excessive force claim against Vadzemnieks. Vadzemnieks filed a motion for summary judgment on this final claim, invoking qualified immunity. The district court, through a magistrate judge, rejected his argument.[5] Vadzemnieks timely appealed.

## II.

In the ordinary course of litigation, summary judgment is appropriate if there is no genuine dispute of material fact.[6] This case involves an appeal arising out of the district court's denial of qualified immunity, which the Court has held is a collateral order capable of immediate review.[7] The standard of review we deploy here differs from the one we use in workaday summary judgment cases. Because of this case's posture, we lack jurisdiction to determine whether any particular factual disputes are *genuine*.[8] Instead, our review is limited to determining whether the factual disputes that the district court identified are *material* to the application of qualified immunity.[9] Put another way, this court lacks jurisdiction to determine "whether the defendant[] did, in fact, engage in [a certain course of] conduct"; it only possesses jurisdiction to examine whether that conduct "would, as a matter of law, be objectively unreasonable in light of clearly established law."[10]

---

[5] The district court did, however, dismiss Samples's Fourteenth Amendment excessive force claims as constitutionally infirm and duplicative, agreeing with Vadzemnieks that the Fourth Amendment is the appropriate basis for such claims.

[6] *See* Fed R. Civ. P. 56(a).

[7] *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

[8] *See Kinney v. Weaver*, 367 F.3d 337, 346–47 (5th Cir. 2004) (en banc); *Thompson v. Upshur Cty.*, 245 F.3d 447, 455–56 (5th Cir. 2001).

[9] *See id.* at 456.

[10] *Kinney*, 367 F.3d at 346.

No. 17-20350

We accept the plaintiff's version of the facts as true and review it through the lens of qualified immunity.[11] In resolving the purely legal questions, we apply a de novo standard.[12]

### III.

Our legal inquiry into the availability of qualified immunity fits into a two-step framework. First, taking the facts in the plaintiff-friendly light that we must, we need to determine whether Vadzemnieks violated a constitutional right.[13] Second, we must ask whether Vadzemnieks's actions violated clearly established rights "of which a reasonable person would have known."[14] We may answer these questions in the order we prefer.[15]

### A.

We begin with the question of constitutional harm. To state an excessive force claim under the Fourth Amendment, a plaintiff "must show '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'"[16]

Vadzemnieks does not dispute that Samples's subdural hematoma is a sufficient injury to ground a claim of excessive force, for under our prevailing caselaw it is.[17] Instead, Vadzemnieks takes aim at the second and third elements of Samples's excessive force claim: causation and excessiveness.

---

[11] *See id.* at 348.

[12] *Thompson*, 245 F.3d at 456.

[13] *See Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016).

[14] *Id.*

[15] *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[16] *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).

[17] *See id.* at 744–45 (explaining that an injury relating to excessive force need only be more than de minimis).

No. 17-20350

**i.**

Vadzemnieks argues that no facts in the record could support a jury's conclusion that the decision to tase Samples *caused* the brain injury. According to Vadzemnieks, this is so because "[t]he story [of how Samples came to be out on the street] will remain untold" due to his memory loss, and that means there is an insoluble possibility that Samples actually suffered the brain injury at some point before the officers arrived on the scene. Vadzemnieks also argues that no evidence contradicts the statements made by him and McGregor—and neither of the officers "recall[ed]" or "saw" a direct head injury to Vadzemnieks.

This argument is meritless on both procedural and conceptual grounds. First, the district court held that "[b]ased on the record, a reasonable jury could conclude that it was more likely than not that Samples's head injury happened when he fell to the ground after being hit [] by a taser." As a procedural matter, we're then barred from gainsaying this determination and must accept that there is indeed a genuine factual dispute about causation. But even if we were free to do so, we would have little hesitation in coming to the same conclusion. It is undisputed that Samples's skull was cracked, suggesting a heavy fall; it is undisputed that Samples fell backwards, head towards the center of the street, after being tased; it is undisputed that when EMS arrived, Samples was lying face-down in the street, with fresh abrasions along the side of his face. While the officers may not have seen—or could not recall seeing—Samples suffer a head injury, they both saw him fall backwards. It is eminently reasonable to infer that when someone goes limp and falls backwards, a head eventually hits the ground.[18]

---

[18] *See Mouille v. City of Live Oak*, 918 F.2d 548, 553–54 (5th Cir. 1990) ("In today's case, it is reasonable to infer from the plaintiffs' proof that [a plaintiff's] leg and groin injuries, which immediately followed, resulted from [the defendant's] use of excessive force."); *cf.* Restatement (Second) of Torts § 328D (1965) ("Res Ipsa Loquitur.").

**ii.**

Vadzemnieks argues that his decision to tase Samples was neither "excessive" nor "clearly unreasonable." The Supreme Court has explained that inquiry into whether a particular use of force was reasonable "must be judged from the perspective of a reasonable officer on the scene,"[19] and the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments."[20] Courts customarily consider three factors in making this inquiry: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[21]

Because of the constraints of interlocutory review, we must assume that Samples was "clearly unarmed," "not attempting to flee," not "combative," and, of course—as it is not contested—that he was middle aged and very slight of stature. Further, there are seemingly factual disputes about whether or not McGregor ever formally commanded Samples to enter his patrol car or stop moving—as opposed to merely cajoling him to do so repeatedly—and whether Samples "broke away" from McGregor and entered a "fighting stance," or whether he merely clenched his fists and tensed up when McGregor grabbed him. For the purposes of assessing their materiality, we assume that all of these disputes will be resolved in the light most favorable to Samples.

We conclude that the evidence is sufficient for a jury to find that Vadzemnieks used excessive force in violation of the Fourth Amendment. We

---

[19] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[20] *Id.* at 396–97.

[21] *Id.* at 396.

have repeatedly held in the past that a taser is a force that, deployed when not warranted, can result in a constitutional deprivation.[22]

First, the record indicates that the only call McGregor and Vadzemnieks received was for a "possible disturbance" in which a "white male, approximately 40 years old[] [was] calling for help." Vadzemnieks thus had little reason to believe Samples was in the process of perpetrating a crime. Second, assuming that Samples was indeed "not attempting to flee"—and, indeed, that he had never been formally commanded to stop—it cannot be sustained that he was "actively resisting arrest or attempting to evade arrest by flight" such that a taser was necessary. The record suggests that Samples was wandering around when the officers found him, declined to heed their requests, and tensed up when McGregor grabbed him. This is not active resistance or flight. Third, and finally, since Samples was "clearly unarmed" and not "combative," nothing suggests that Samples "pose[d] an immediate threat to the safety of the officers or others"—particularly in light of his relatively advanced age and slight size. The officers' statements to the opposite effect are overwrought.

In short, the officers lacked reason to believe that Samples committed a crime, sought to flee, or posed a threat of danger to them. We conclude that the first prong of the qualified immunity inquiry is satisfied: the evidence is sufficient to show that Vadzemnieks violated Samples's Fourth Amendment right to be free of excessive force.

**B.**

A constitutional violation is necessary but not sufficient for a denial of qualified immunity. We must also decide whether Vadzemnieks's conduct violated "clearly established . . . constitutional rights of which a reasonable

---

[22] *See, e.g.*, *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012).

person would have known."[23] Clearly established law must be particularized to the facts of a case.[24] Thus, while a case need not be "directly on point," precedent must still put the underlying question beyond debate.[25]

Vadzemnieks and Samples each marshal caselaw asserting to resolve the question of clearly established law. In our view, *Carroll v. Ellington* provides the closest analogue.[26] In *Carroll*, an officer repeatedly deployed a taser on a schizophrenic man who, like Samples, spoke incomprehensibly when questioned about his identity and conduct, such that the officer believed him to be on drugs.[27] As here, the officer in *Carroll* knew that the suspect was unarmed and nonviolent when the officer first elected to tase him.[28] And like Samples, the suspect only weighed approximately 160 pounds.[29] Some aspects of *Carroll* distinguish it from this case—the suspect in *Carroll* was theoretically under suspicion for a minor crime,[30] and the officer in that case issued repeated commands, not requests, that he stop moving.[31] But the primary contours are the same. In both cases, officers confronted a suspect whom they believed to be on drugs, attempted to verbally secure the suspect's compliance, and chose to deploy a taser despite their knowledge that the suspect was unarmed. Faced with these facts, the *Carroll* panel decided that, as of three years ago, no clearly established law made the officer's decision to resort to the taser unreasonable. And equally important, the *Carroll* panel "decline[d] to reach the close constitutional question" of whether the officer's

---

[23] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted).

[24] *See id.*

[25] *See id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[26] *See Carroll v. Ellington*, 800 F.3d 154 (5th Cir. 2015).

[27] *See id.* at 162-63.

[28] *See id.* at 174 (evaluating the use of a taser on a "seated and unarmed" suspect).

[29] *See id.* at 165.

[30] *See id.* at 171.

[31] *See id.* at 163.

11

actions amounted to a Fourth Amendment violation, resting its decision solely on the second prong of qualified immunity.

Samples struggles to show that Vadzemnieks's conduct violated clearly established law. But his task is made insurmountably difficult by *Carroll*. He points to *Ramirez v. Martinez*[32] and *Newman v. Guedry*.[33] But those cases are factually farther afield—neither of them, nor any other case he cites, presented a situation in which police officers had to decide whether to deploy a taser on an uncooperative suspect who appeared to be drug-addled or otherwise unstable.[34] Similarly, for its part, the district court relied on two traffic stop cases involving suspects who were able to communicate clearly with the officers and who could readily understand their situations.[35] The difference here is at least plausibly important: erratic, unpredictable behavior on the part of a suspect could lead officers to fear sudden or particularly severe violent outbursts, which could in turn give them license to resort to force more readily than in each of the cases cited by Samples or the district court.

In light of *Carroll*'s express reservation of so similar a constitutional question, and in light of the Court's repeated instruction that caselaw involving excessive force claims must be sufficiently particularized and must put the issue altogether "beyond debate," we must conclude that Vadzemnieks's actions did not violate law that was clearly established at the time of the incident. Vadzemnieks is therefore entitled to qualified immunity.

**IV.**

Vadzemnieks violated Samples's Fourth Amendment right to be free of excessive force, but that alone is not enough for him to recover. Right or wrong,

---

[32] 716 F.3d 369 (5th Cir. 2013).

[33] 703 F.3d 757 (5th Cir. 2012).

[34] *See Ramirez*, 716 F.3d at 372; *Newman*, 703 F.3d at 762–63.

[35] *See Hanks*, 853 F.3d at 741–43; *Deville v. Marcantel*, 567 F.3d 156, 161–62 (5th Cir. 2009).

the very premise of qualified immunity is that not every constitutional violation suffered by plaintiffs like Samples is redressable. While recognizing an uncertainty of law that sustains the defense of qualified immunity, this opinion has bite, for it offers guidance to officers. We reverse the district court's denial of summary judgment to Vadzemnieks and render judgment for him.